# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
# Wheeling

**OHIO VALLEY ENVIRONMENTAL**
**COALITION** and **THE SIERRA CLUB**,

        Plaintiffs,

      v.                                        **Civil Action NO. 5:19-CV-236**
                                                            Judge Bailey

**EAGLE NATRIUM, LLC**,

        Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pending before this Court are Defendant's Motion for Summary Judgment [Doc. 13], Defendant's Motion for Stay of Discovery or to Modify the Scheduling Order [Doc. 36], and Defendant's Motion to Expedite Consideration of its Motion for Stay of Discovery or to Modify the Scheduling Order [Doc. 38]. All Motions have been fully briefed and are ripe for disposition.

Plaintiffs filed this citizen suit against Eagle Natrium LLC ("Eagle") under the Clean Water Act ("CWA"), alleging that Eagle has discharged pollutants from its Natrium, West Virginia plant in violation of its CWA discharge permit. Eagle has moved for summary judgment, arguing that Plaintiffs' action is barred by the CWA's preclusion provisions because the same violations have been diligently prosecuted by the West Virginia Department of Environmental Protection ("WVDEP") in 2010 and 2013 judicial consent orders.

1

The purpose of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In service of those ends, the statute prohibits the "discharge of any pollutant by any person" unless such discharge complies with the provisions of the CWA. *See* 33 U.S.C. § 1342(a)(1). One such provision, codified at 33 U.S.C. § 1342, "established a National Pollution Discharge Elimination System ["NPDES"] ... that is designed to prevent harmful discharges into the Nation's waters." *Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, Maryland*, 523 F.3d 453, 455–56 (2008) (quoting *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650 (2007)). NPDES requires dischargers to obtain permits that contain effluent limitations—restrictions on the type and quantity of pollutants that can be released into the water. *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004). In effect, the NPDES program transforms the generally applicable requirements of the CWA into specific obligations imposed upon individual polluters. *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976). *Sierra Club v. ICG Eastern, LLC*, 833 F.Supp.2d 571, 573 (N.D. W.Va. 2011).

The issuance of a NPDES permit does not authorize the recipient to pollute at will. All NPDES permits authorizing the discharge of pollutants are conditioned upon satisfaction of the applicable requirements of the Clean Water Act. 33 U.S.C. §§ 1342(a)(1) and (b)(1). . . . NPDES permits also require the holder to establish and maintain records; install, use, and maintain monitoring equipment; sample point source effluent; and submit "discharge monitoring reports" ("DMRs") at regular intervals specified in the permit. 33 U.S.C. § 1318(a)(4)(A); 40 C.F.R. § 122 .41(l)(4). "Noncompliance with a permit constitutes a

violation of the [Clean Water] Act." ***Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.***, 528 U.S. 167, 175 (2000) (citing 33 U.S.C. § 1342(h)). ***Sierra Club v. Powellton Coal Co., LLC***, 2010 WL 454929, *1 (S.D. W.Va. Feb. 3, 2010) (Copenhaver, J.).

The Environmental Protection Agency ("EPA") initially administers the NPDES program for each state, but the states may apply for a transfer of permitting authority to state officials. ***Nat'l Ass'n of Home Builders***, 551 U.S. at 650. Once authority is transferred, state officials are responsible for reviewing and approving NPDES permits. *Id.* However, the EPA retains an oversight role in the permitting process; the state must advise the EPA of each permit it proposes to issue, and the EPA may lodge an objection to any permit. *Id.* at 650 n. 1 (citing 33 U.S.C. §§ 1342(d)(1), (2); 40 C.F.R. § 123.44(c)). If the state fails to resubmit a revised permit that satisfies the EPA's objection, authority over the permit reverts to the EPA. *Id.* at 650 n. 1 (citing 33 U.S.C. § 1342(d)(4)).

The NPDES permit program is "[t]he cornerstone of the Clean Water Act's pollution control scheme...." ***Sierra Club v. Powellton Coal Co., LLC***, 2010 WL 454929, *1 (S.D. W.Va. Feb. 3, 2010) (Copenhaver, J.), quoting ***Natural Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency***, 822 F.2d 104, 108 (D.C. Cir. 1987).

On May 10, 1982, the EPA approved West Virginia's NPDES program, 47 Fed.Reg. 22,363 (May 24, 1982), which is administered by the West Virginia Department of Environmental Protection ("WVDEP"). *See* Water Pollution Control Act, W.Va. Code §§ 22–11–1 through 29. Permits issued under the West Virginia NPDES program are known as West Virginia National Pollution Discharge Elimination System ("WV/NPDES")

permits. ***Powellton Coal***, at *2.

## Background and Facts

1. Eagle owns and operates a chlor-alkali plant in Natrium, West Virginia (the "Plant") that produces chlorine, caustic, brine, calcium hypochlorite, and hydrochloric acid. One of the Plant's production lines uses mercury cells to produce chlorine and caustic soda.

2. On July 14, 2005, the WVDEP issued NPDES Permit No. WV0004359 (the "Permit") to the defendant's predecessor, PPG Industries, Inc. ("PPG"), for operations at its Natrium Plant located in Marshall County, West Virginia.

3. On January 28, 2013, PPG transferred ownership of its Natrium Plant to the defendant, a subsidiary of Axiall Corporation. Eagle Natrium is now a subsidiary of Westlake Chemical.

4. The Permit is still in effect for the Plant site, having been extended on multiple occasions.

5. It sets limits on the discharges of substances from the Natrium Plant into the Ohio River. Of principal interest for purposes of this lawsuit were the limits for mercury discharges from Outlet 009 and Benzene hexachloride ("BHC"), in the form of BHC-Alpha, BHC-Beta, and BHC-Gamma from Outlets 011 and 012.

6. On May 15, 2009, WVDEP filed a civil action against PPG in the Circuit Court of Marshall County, West Virgnia, for violations of WV/NPDES Permit No. WV0004359.

7. That lawsuit, ***Mandirola v. PPG Industries, Inc.***, Marshall County Civil Action No. 09-C-98H, is still active on the Court's docket.

8. The Complaint alleged violations of discharge limitations for "among other things, Mercury, Iron, Copper, Chlorine, Total Suspended Solids, Sulfides and Aluminum" and requested an injunction against further noncompliant discharges and demanded penalties.

9. As a result of that suit, the parties entered into a consent order (the "Consent Order") on August 18, 2010, which set forth the terms for compliance, including work on the water wells, mercury treatment system, and chlorine sewer; assessed penalties in the amount of $1,370,000 for past noncompliance; stipulated penalties between $1,000 and $6,000 for future noncompliance with any Permit limits; and ordered quarterly reporting on compliance activities. For injunctive relief, the 2010 order directed PPG to install and operate treatment technology by July 31, 2011, that was "capable of treating water to a level that ensures compliance with effluent limitations at PPG's outfalls."

10. The Consent Order was approved by the Circuit Court of Marshall County on August 18, 2010.

11. The parties subsequently stipulated to the First Amendment to the Consent Order (the "First Amendment"), which was approved by the Circuit Court of Marshall County on May 6, 2013.

12. The 2013 order imposed a civil penalty of an additional $248,968 for the violations through May 6, 2013.

### Mercury Limits

13. The Permit limits for mercury were originally set at 0.124 µg/L[4] monthly average and 0.215 µg/L daily maximum, as a mixing zone for mercury was permitted until October 16, 2013. The Permit limits for mercury were set to change on October 16, 2013.

14. After October 16, 2013, the defendant would have been expected to meet mercury standards "end-of-pipe", meaning no mixing zone would be allowed and Permit mercury limits would have been 0.0088 µg/L monthly average and 0.0208 µg/L daily maximum.

15. The Permit limits for mercury were set to change on October 16, 2013, because that was the date set by the Ohio River Valley Water Sanitation Commission ("ORSANCO") for the elimination of mixing zones for certain substances in the Ohio River.

16. Knowing that end-of-pipe mercury limits would be difficult to achieve, the defendant petitioned ORSANCO to approve a variance from the PCS Chapter 4.F mixing zone prohibition.

17. The variance request was approved by the WVDEP on October 11, 2012, with an effective date of October 16, 2013.

18. On October 10, 2013, ORSANCO voted to extend the beginning date of the prohibition of mixing zones for BCCs and to change the effective date of the defendant's variance to October 16, 2015.

19. On October 8, 2015, before any mixing zone prohibition for BCCs could go into effect, ORSANCO approved a change in PCS Chapter 4.F and required the elimination of mixing zones for BCCs "as soon as practicable as determined by the permitting authority" rather than by a date certain.

20. The defendant was then issued Administrative Order 8463 ("AO 8463") by the WVDEP on October 15, 2015, which established interim mercury limitations of 0.124 ug/L monthly average and 0.215 ug/L daily maximum were established, effective until February 28, 2016.

21. The defendant was also ordered to develop a plan for meeting end-of-pipe mercury limits and submit it to the WVDEP by January 31, 2016. The defendant did so, but the WVDEP did not complete its review of the plan, and by letter extended the interim mercury limits established by AO 8463 to June 30, 2016.

22. A subsequent order has extended the interim limits of AO 8463 to June 30, 2020.

23. Neither the 2015 ACO nor the 2016 and 2019 amendments to it were subjected to public notice or opportunity for comment.

24. If the interim limits are applicable, the limits have been exceeded only four times in the last four years. If the final mercury limits are applicable, however, the limits have been exceeded 117 times in the last four years.

**BHCs**

25. The First Amendment specified the stipulated penalties that would apply to violations of limits for Benzene hexachlorides ("BHC"), in the form of BHC-Alpha, BHC-Beta, and BHC-Gamma, which had gone into effect on July 31, 2011.

26. BHC has not been produced or manufactured at Eagle Natrium since 1961, but it is still present in groundwater and soil.

27. The First Amendment recognized the extensive work that the defendant had engaged in to reduce BHC loading and the costs involved, including in-situ treatment of groundwater ($213,000), a carbon filtration system ($378,000) at Outlet 012, the cleaning and lining of the Outlet 012 sewer line ($547,000), and the redesign of the Outlet 012 outfall structure ($313,000).

28. Because compliance with BHC limits has been problematic despite the

7

defendant's "significant steps towards ensuring consistent, long-term compliance with the final effluent limitations [for BHC] at Outfalls 011 and 012," [Doc. 13-4 at 4], the WVDEP assessed a penalty of $449,968 (for all violations, not just BHC), required updates on efforts to reduce BHC, and established stipulated penalties for noncompliance with BHC limits in the Permit. Id. at pp. 6-8.

29. The First Amendment, approved by the Circuit Court, contains the following provision:

> 13. The parties acknowledge that significant study, evaluation, engineering, and possible construction will be required to develop the BHC Compliance Plan, and that as such it may be appropriate to expedite or extend the December 31, 2015 final compliance date set forth in Paragraph 12 after additional information is developed. In such event, the parties agree to discuss reasonable alternative final compliance dates. Such final compliance dates therefore may be expedited or extended upon written agreement of the parties, which written agreement shall be submitted to the Court for its information. Upon submission to the Court, the expedited or extended final compliance date shall replace the December 31, 2015 final compliance date set forth in Paragraph 12 and it will be incorporated herein as an obligation of this First Amendment to Consent Order.

30. As a condition of the First Amendment, the defendant developed a BHC Compliance Plan for its Natrium Plant and submitted it to the WVDEP on December 19, 2013.

31. This Compliance Plan is still being implemented by the defendant.

32. Under the BHC Compliance Plan the defendant has investigated the origin of BHC that appears in Outfalls 011 and 012, and identified activities that might reduce BHC loading into those outfalls. Also as a condition of the First Amendment, the defendant has provided quarterly updates to the WVDEP on the progress of mitigating activities.

33. The First Amendment has been extended on three separate occasions, most recently until December 31, 2021. Since the entry of the Consent Order, the defendant has been fined 18 times by the WVDEP for violations of BHC Permit limits.

## Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." ***Anderson***, 477 U.S. at 250.

Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." ***Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 586 (1986). That is, once the movant has

met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); **Celotex Corp.**, 477 U.S. at 323-25; Anderson, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." **Anderson**, 477 U.S. at 249 (citations omitted).

## Discussion

The defendant contends that this action is barred by § 1365(b)(1)(B), which bars citizen suits when the EPA or applicable state agency is diligently prosecuting an action in their own right.

On the other hand, the plaintiffs contend that the Administrative Order and extensions were invalid and ineffective due to a lack of notice and comment. Plaintiffs also cite the lack of maximum penalties as an indication of a lack of diligence.

The decision in this case, then, depends on the balancing of two competing interests.

"'Although the primary responsibility for enforcement rests with the state and federal governments, private citizens provide a second level of enforcement and can serve as a check to ensure the state and federal governments are diligent in prosecuting Clean Water Act violations.' **Sierra Club v. Hamilton Cty. Bd. of Cty. Comm'rs**, 504 F.3d 634, 637 (6th Cir. 2007). Specifically, § 505(a) of the CWA, 33 U.S.C. § 1365(a), authorizes citizens 'to bring suit against any NPDES permit holder who has allegedly violated its permit.' **Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.**, 204 F.3d 149, 152 (4th

Cir. 2000) (en banc). We have recognized that this citizen suit provision is 'critical' to the enforcement of the CWA, see id., as it allows citizens 'to abate pollution when the government cannot or will not command compliance,' **Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found, Inc.**, 484 U.S. 49, 62 (1987). However, citizen suits are meant 'to supplement rather than to supplant governmental action,' id. at 60, and the CWA—specifically § 1365(b)(1)(B)—'bars a citizen from suing if the EPA or the State has already commenced, and is "diligently prosecuting," an enforcement action,' **Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.**, 528 U.S. 167, 175 (2000). This 'statutory bar is an exception to the jurisdiction granted in subsection (a) of § 1365, and jurisdiction is normally determined as of the time of the filing of a complaint.' **Chesapeake Bay Found. v. American Recovery Co.**, 769 F.2d 207, 208 (4th Cir. 1985)." **The Piney Run Pres. Ass'n v. The Cnty. Comm'rs of Carroll Cty.**, 523 F.3d 453, 456 (4th Cir. 2008).

Section 505(a) authorizes, "federal courts ... to enter injunctions and assess civil penalties, payable to the United States Treasury, against any person found to be in violation of 'an effluent standard or limitation' under the Act." **Powellton**, supra, at *2, citing **Envtl. Conservation Org. v. City of Dallas**, 529 F.3d 519, 526 (5th Cir. 2008).

The plaintiffs have the burden of proving that subject matter jurisdiction exists. **Evans v. B.F. Perkins Co.**, 166 F.3d 642, 647 (4th Cir. 1999). For purposes of this case, this means that the plaintiffs bear the burden of proving that the WVDEP has not diligently prosecuted the violations of the limitations set forth in the permit. A CWA enforcement prosecution will ordinarily be considered "diligent" if the judicial action "is capable of

requiring compliance with the Act and is in good faith calculated to do so," and diligence is presumed. *Piney Run*, 523 F.3d at 459, citing *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 760 (7th Cir. 2004), *cert. denied*, 544 U.S. 913 (2005); *see also* *Karr v. Hefner*, 475 F.3d 1192, 1198 (10th Cir. 2007) ("Citizen-plaintiffs must meet a high standard to demonstrate that [a government agency] has failed to prosecute a violation diligently."). This presumption "is due not only to the intended role of the [government] as the primary enforcer of the [CWA], but also to the fact that courts are not in the business of designing, constructing or maintaining sewage treatment systems." *Friends of Milwaukee's Rivers*, 382 F.3d at 760 (citation omitted). *See Piney Run*, *supra*.

"'Section 1365(b)(1)(B) does not require government prosecution to be far-reaching or zealous. It requires only diligence.' *Karr*, 475 F.3d at 1197. Thus, a citizen-plaintiff cannot overcome the presumption of diligence merely by showing that the agency's prosecution strategy is less aggressive than he would like or that it did not produce a completely satisfactory result. *Id*. Moreover, the fact that an agency has entered into a consent decree with a violator that establishes a prospective schedule of compliance does not necessarily establish lack of diligence. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 318 (1982) (noting that 'enforcement actions typically result, by consent or otherwise, in a remedial order setting out a detailed schedule of compliance designed to cure the identified violation of the Act' (internal quotation marks omitted)). Indeed, when presented with a consent decree we must be particularly deferential to the agency's expertise, and we 'should not interpret § 1365 in a manner that would undermine the [government's] ability

to reach voluntary settlements with defendants.' **Karr**, 475 F.3d at 1198. As the Supreme Court has recognized: 'If citizens could file suit ... in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably.' **Gwaltney**, 484 U.S. at 61." **Piney Run**, 523 F.3d at 529-30.

As noted, "diligence on the part of the State is presumed. *See, e.g.,* ***Connecticut Fund for the Env't v. Contract Plating Co.***, 631 F.Supp. 1291, 1293 (D. Conn. 1986) ("[T]he court must presume the diligence of the state's prosecution of a defendant absent persuasive evidence that the state has engaged in a pattern of conduct that could be considered dilatory, collusive, or otherwise in bad faith."). ***Friends of Milwaukee's Rivers***, 382 F.3d at 760.

"Particularly when the EPA chooses to enforce the CWA through a consent decree, failure to defer to its judgment can undermine agency strategy. If a defendant is exposed to a citizen suit whenever the EPA grants it a concession, defendants will have little incentive to negotiate consent decrees. The Supreme Court has recognized the importance of deference to the EPA's bargains:

> Suppose ... that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit ... in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be

curtailed considerably.

*Gwaltney*, 484 U.S. at 60–61. As one court nicely put it, 'An Administrator unable to make concessions is unable to obtain them.' [*Supporters to Oppose Pollution, Inc. v.*] *Heritage Group*, 973 F.2d at 1324 [(7th Cir. 1992)]; *see* *Ark. Wildlife Fed'n v. ICI Americas, Inc.*, 29 F.3d 376, 380 (8th Cir. 1994) ('It would be unreasonable and inappropriate to find failure to diligently prosecute simply because [defendants] prevailed in some fashion or because a compromise was reached.'). We should not interpret § 1365 in a manner that would undermine the EPA's ability to reach voluntary settlements with defendants." *Karr v. Hefner*, 475 F.3d 1192, 1197-98 (7th Cir. 2007).

"In sum, our evaluation of the EPA's diligence is quite deferential. Citizen-plaintiffs must meet a high standard to demonstrate that it has failed to prosecute a violation diligently. *See, e.g.*, [*North and South Rivers Watershed Assoc., Inc. v.*] *Scituate*, 949 F.2d at 557 [(1st Cir. 1991)] ('Where an agency has specifically addressed the concerns of an analogous citizen's suit, deference to the agency's plan of attack should be particularly favored.'); *Community of Cambridge Envtl. Health Cmty. & Dev. Group v. City of Cambridge*, 115 F.Supp.2d 550, 554 (D. Md. 2000) ('Most courts considering the diligence of a state or federal prosecution have exhibited substantial deference for the agency's process.'); *Williams Pipe Line Co. v. Bayer Corp.*, 964 F.Supp. 1300, 1324 (S.D. Iowa 1997) ('The plaintiff in a citizens suit bears the burden of proving the state agency's prosecution was not diligent. The burden is heavy, because the enforcement agency's diligence is presumed. The ... agency must be given great deference to proceed in a manner it considers in the best interests of all parties involved.' (citations, brackets,

and internal quotation marks omitted))." *Karr* at 1198.

In *North and South Rivers Watershed Assoc., Inc. v. Scituate*, 755 F.Supp. 484 (D. Mass. 1991), "the court found that an Order requiring the Town to 'take all steps necessary to plan, design, and construct facilities necessary to adequately treat and dispose of all wastewater' in accordance with local, state, and federal regulations constituted diligent prosecution. *Id*. at 487 (noting also that the state environmental agency did not assess any penalties but left open the possibility that such penalties would be assessed in the future). Additionally, the statute does not require success, but rather that an agency 'try, diligently.' *Supporters to Oppose Pollution Inc. v. Heritage Group*, 973 F.2d 1320, 1324 (7th Cir. 1992) (rejecting plaintiff's assertions that their definition of success must be the benchmark of diligent prosecution)." *Community of Cambridge Envtl. Health Cmty. & Dev. Group v. City of Cambridge*, 115 F.Supp.2d 550, 555 (D. Md. 2000).

With respect to the issue of the BHC remediation, this Court finds that the plaintiffs have failed to meet their high burden of showing a lack of diligence. The First Amendment approved by the Court specifically permitted extensions of compliance dates. This is especially understandable since the BHCs emanate from an industrial process which ceased almost 60 years ago, rather than from some current process under the defendant's control.

The record shows that Eagle has spent significant funds in attempting to prevent future leaking of these chemicals from the soil into the Ohio River. They have paid fines which are not insignificant albeit not as much as the plaintiffs would want.

The fact that the WVDEP may not have been as aggressive as the plaintiffs would like does not establish a lack of diligence. See *Piney Run*, supra, at 459; *Karr*, supra, at 1199; *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004); *Scituate*, supra, at 558 ("violations may continue despite everything reasonably possible being done by the state and Appellee to correct them.").

That portion of the Motion for Summary Judgment with respect to the BHC issue is **GRANTED**.

The issue of the Mercury levels presents a different issue. The Fourth Circuit has made it clear that the WVDEP cannot change or modify the terms of a NPDES permit without following the "specific, mandatory procedures for modification." *Sierra Club v. U.S. Army Corps of Engineers*, 909 F.3d 635, 653 (4th Cir. 2018) citing *United States v. Smithfield Foods, Inc.*, 965 F.Supp. 769, 787 (E.D. Va. 1997). This includes "public notice and participation safeguards ... to ensure that interested citizens have an opportunity to contest administrative actions." 909 F.3d at 654.

Accordingly, inasmuch as the WVDEP failed to follow the appropriate procedures to modify the NPDES permit, the permit was not modified by AO 8463. Inasmuch as the permit was not modified by AO 8463, the final mercury levels contained in the permit are in effect. Inasmuch as the final mercury levels are in effect, the WVDEP is enforcing the wrong standard in its pending action against the defendant. Inasmuch as WVDEP is enforcing the wrong standard, it cannot be said to be diligently prosecuting the action against the defendant. For those reasons, the defendant's Motion for Summary Judgment will be denied with respect to the enforcement of the mercury discharge limit.

For the reasons stated above, Defendant's Motion for Summary Judgment [**Doc. 13**],

is **GRANTED IN PART** and **DENIED IN PART**.

Inasmuch as this Court has issued an Order modifying the scheduling order, Defendant's Motion for Stay of Discovery or to Modify the Scheduling Order [**Doc. 36**], and Defendant's Motion to Expedite Consideration of its Motion for Stay of Discovery or to Modify the Scheduling Order [**Doc. 38**] are **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to any counsel of record herein.

**DATED:** March 24, 2020.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE